UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| LEROY CARHART, M.D., WILLIAM G. FITZHUGH, M.D., WILLIAM H. KNORR, M.D., and JILL L. VIBHAKAR, M.D., on behalf of themselves and the patients they serve,<br><br>　　　　　　　　　　Plaintiffs,<br><br>v.<br><br>JOHN ASHCROFT, in his official capacity as Attorney General of the United States, and his employees, agents and successors in office,<br>　　　　　　　　　　Defendant. | CIVIL ACTION<br>NO: _____ |

## COMPLAINT

Plaintiffs, by and through their undersigned attorneys, bring this Complaint against the above-named Defendant, his employees, agents, and successors in office, and in support thereof allege the following:

**I.   Preliminary Statement**

1.   This civil rights action is a facial challenge to the constitutionality of S.3, the "Partial-Birth Abortion Ban Act of 2003," 108th Cong. (to be codified at 18 U.S.C. §1531) (hereafter "the Act"). The Act passed the House of Representatives on October 2, 2003 and the Senate on October 21, 2003.  The Act was sent to the President on Tuesday, October 28, 2003; it must be

signed no later than Saturday, November 8, 2003. The President has made clear his intent to sign the bill. *See* Statement by President George W. Bush, President Applauds Congress for Partial-Birth Abortion Bill (October 21, 2003), available at http://www.whitehouse.gov/news/releases/ 2003 /10/ 20031021-16.html (last visited Oct. 22, 2003) ("I look forward to signing it into law."). The Act will take effect within hours of the President's signing. 18 U.S.C. § 1531(a) (the Act's prohibitions take effect the day after signing).

2. Plaintiffs seeks declaratory and injunctive relief (including preliminary injunctive relief) against the Act which, upon pain of criminal and civil penalties, bans the "knowing" performance of abortion procedures that fall within the Act's definition of "partial-birth abortion."

3. The Act must be enjoined and declared unconstitutional because it suffers from the identical two flaws as the Nebraska statute struck down by this Court and by the United States Supreme Court in *Stenberg v. Carhart*, 530 U.S. 914 (2000), *aff'g* 11 F. Supp. 2d 1099 (D. Neb. 1998). *First*, despite the Supreme Court's clear mandate in *Carhart*, the Act fails to include *any* exception to the prohibition on abortion procedures "'where it is necessary, in appropriate medical judgment for the preservation of the . . . health of the mother.'" *Id.* at 931 (quoting *Casey*, 505 U.S. at 879).[1] Thus, the Act prohibits physicians from exercising their professional medical discretion to determine the most appropriate procedure for their patients, and bars physicians from providing, and their patients from obtaining, the safest abortion possible.

4. *Second*, the Act defines the term "partial-birth abortion" so broadly as to ban the safest and most common methods of abortion starting at least at the beginning of the second-trimester of pregnancy, including the Dilation and Evacuation ("D&E") method of abortion, and

---

[1] The Act also contains an inadequate exception to save the *life* of the woman. *See infra* at ¶¶ 20, 53.

thus "imposes an undue burden on a woman's ability" to choose abortion. *Carhart*, 530 U.S. at 930 (quoting *Planned Parenthood v. Casey*, 505 U.S. 833, 874 (1992)). Alternatively, the Act is so vague that it fails to give physicians fair warning of which abortion procedures are prohibited.

5. Thus, the Act violates the rights of Plaintiffs and their patients to privacy, bodily integrity and autonomy, liberty, life, due process, and equal protection guaranteed by the Fifth Amendment of the United States Constitution.

## II.  Jurisdiction and Venue

6. This case, arising under the Constitution and laws of the United States, presents a federal question with this Court's jurisdiction under 28 U.S.C. §§ 1331.

7. Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, by Rules 57 and 65 of the Federal Rules of Civil Procedure, and by the general legal and equitable powers of this Court.

8. Venue is appropriate under 28 U.S.C. § 1391(e)(3) because the defendant is an officer of the United States and Plaintiff LeRoy Carhart, M.D., resides in this district and no real property is involved in this action.

## III.  Parties
### A.  Plaintiffs

9. Plaintiff LeRoy Carhart, M.D., is a physician licensed to practice medicine in Nebraska, Iowa, Indiana, Kansas, Ohio, Pennsylvania, New Jersey, and Wisconsin. Dr. Carhart performs, and has performed in the recent past, abortions in these states. Dr. Carhart performs abortions, including D&E abortions, that may fall within the proscriptions of the Act. As a result, Dr. Carhart reasonably fears that he and his employees and agents will be subject to criminal prosecution and civil liability under the Act. Dr. Carhart sues on his own behalf, on

behalf of his patients seeking abortions, and on behalf of his staff or agents who assist in the performance of second-trimester abortions and who are at risk of criminal prosecution and civil lawsuits under the Act.

10. Plaintiff William G. Fitzhugh, M.D., is a physician licensed to practice medicine in Virginia. Dr. Fitzhugh performs abortions, including D&E abortions, that may fall within the proscriptions of the Act, and he reasonably fears that he and his agents will be subject to criminal prosecution and civil liability under the Act. Dr. Fitzhugh sues on his own behalf, on behalf of his patients seeking abortions, and on behalf of his staff or agents who assist in the performance of second-trimester abortions and who are at risk of criminal prosecution and civil lawsuits under the Act.

11. Plaintiff William H. Knorr, M.D., is a physician licensed to practice medicine in Georgia, Alabama, South Carolina, Maryland (inactive), and New York. Dr. Knorr performs abortions in New York State that may fall within the proscriptions of the Act, including D&E abortions. Moreover, as the medical director and co-owner of the Savannah Women's Medical Clinic in Savannah, Georgia, Dr. Knorr supervises the performance of abortions that may fall within the proscriptions of the Act, including D&E abortions. Dr. Knorr reasonably fears that he and his employees and agents will be subject to criminal prosecution and civil liability under the Act. Dr. Knorr sues on his own behalf, on behalf of his patients seeking abortions, and on behalf of his staff or agents who perform, or assist in the performance of, abortions and who are at risk of criminal or civil liability under the Act.

12. Plaintiff Jill L. Vibhakar, M.D., is a physician licensed to practice medicine in the State of Iowa. Dr. Vibhakar performs abortions, including D&E and induction abortions, that may fall within the proscriptions of the Act, at the Emma Goldman Clinic for Women and at the University of Iowa College of Medicine Hospital in Iowa City, Iowa. Dr. Vibhakar is an

4

obstetrician and gynecologist and Assistant Professor of Clinical Obstetrics and Gynecology at the University of Iowa College of Medicine where she trains residents and medical students in the provision of second-trimester abortions. Dr. Vibhakar reasonably fears that she, the employees and agents of the Emma Goldman Clinic for Women, the medical residents and medical students she trains, as well as those employees and agents of the University of Iowa College of Medicine Hospital who perform or assist in second-trimester abortions will be subject to criminal prosecution and civil liability under the Act. Dr. Vibhakar sues on her own behalf, on behalf of her patients seeking abortions, and on behalf of the medical residents and their faculty supervisors, and health care facility staff who perform, assist in the performance of, supervise, and/or train in the provision of, second-trimester abortion services with Dr. Vibhakar and who are at risk of criminal prosecution and civil lawsuits under the Act.

13. Among the Plaintiffs' patients are women seeking second-trimester abortions. Some of these women have pregnancies complicated by severe or fatal fetal anomalies; some are pregnant as a result of rape or incest; some are in need of abortion services to protect their health and lives; and some have delayed obtaining an abortion for a wide range of other deeply personal reasons.

  **B.**   **Defendant**

14. Defendant John Ashcroft is the Attorney General of the United States. He is charged with enforcing the challenged provision. *See* 28 U.S.C. §515 (a); 28 U.S.C. §547. He is sued in his official capacity, as are his employees, agents, and successors in office.

## IV. Statutory Framework

15. Under the Act, "any physician who, in or affecting interstate or foreign commerce, knowingly performs a partial-birth abortion and thereby kills a human fetus shall be fined under this title or imprisoned not more than 2 years, or both." 18 U.S.C. §1531(a).

16. The term "partial-birth abortion" is defined as:

>an abortion in which the person performing the abortion --
>
>(A) deliberately and intentionally vaginally delivers a living fetus until, in the case of a head-first presentation, the entire fetal head is outside the body of the mother, or, in the case of breech presentation, any part of the fetal trunk past the navel is outside the body of the mother for the purpose of performing an overt act that the person knows will kill the partially delivered living fetus; and
>
>(B) performs the overt act, other than completion of delivery, that kills the partially delivered living fetus.

18 U.S.C. §1531(b)(1).

17. The Act provides no definition of the terms "living," "outside the body of the mother," or "overt act, other than completion of delivery."

18. The Act provides a physician with no guidance as to when performance of an abortion banned by the Act is "in or affecting interstate or foreign commerce."

19. The prohibitions of the Act apply throughout pregnancy, regardless of fetal viability, i.e., that stage in pregnancy at which the fetus is capable of sustained, independent survival outside of the womb.

20. The Act contains only a limited exception for a woman's life. It provides that its prohibitions do not apply to a "'partial-birth abortion' that is necessary to save the life of a [woman] whose life is endangered by a physical disorder, physical illness, or physical injury, including a life-endangering physical condition caused by or arising from the pregnancy itself." 18 U.S.C. §1531(a). Thus, the Act contains no exception for abortions necessary to save the life

of a woman whose life is endangered by a mental disorder, illness, or injury; nor does this exception appear to allow performance of a banned abortion if another riskier procedure was available to save the woman's life.

21. The Act contains *no* exception for procedures or actions taken to preserve a woman's health.  Thus, physicians are not permitted to perform a procedure that falls within the Act's proscription, even if it is the most appropriate for the woman's health and is the procedure of her choice.

22. The Act contains no exception for medical emergencies.

23. In addition to providing criminal penalties, *see* 18 U.S.C. §1531(a), the Act also subjects providers to civil lawsuits.  The Act provides that "the father [of the fetus], if married to the [woman] at the time she receives a partial-birth abortion procedure," or "the maternal grandparents" of the fetus, if the woman is under 18 years of age, may:

> in a civil action obtain appropriate relief, unless the pregnancy resulted from the plaintiff's criminal conduct or the plaintiff consented to the abortion.

18 U.S.C. §1531(c)(1).  Such relief shall include "money damages for all injuries, psychological and physical, occasioned by the violation of this section; and . . .statutory damages equal to three times the cost of the partial-birth abortion."  18 U.S.C. §1531(c)(2).

24. Although the Act provides that a woman upon whom a partial-birth abortion is performed may not be criminally prosecuted for her involvement in a "partial-birth abortion," 18 U.S.C. §1531(e), the Act does not appear to exempt the woman from civil liability to her husband or parents.  *Id*.

25. Moreover, the Act subjects the physician to civil lawsuits even if the partial-birth abortion was necessary to save the life of the woman.  *See* 18 U.S.C. §1531(a) (noting that "*this*

," providing for criminal penalties, "does not apply to a partial-birth abortion that is necessary to save the life of a mother . . .") (emphasis added).

26. Finally, the Act allows a physician to "*seek* a hearing before the State Medical Board" on whether the physician's conduct qualifies under the life exception. 18 U.S.C. §1531(d)(1) (emphasis added). The findings on that issue are admissible at trial, 18 U.S.C. §1531(d)(2) and therefore, may be used as a defense in a criminal or civil proceeding. However, the Act does not guarantee that the physician defendant will receive such a hearing; rather this decision appears to be subject to the arbitrary discretion of the individual State Medical Board.

## V. Statement of Facts

27. Abortion is one of the safest surgical procedures. Overall, abortion has both a lower morbidity (non-fatal complication) rate and a lower mortality rate than carrying a pregnancy through childbirth.

28. Abortion has become increasingly safe since 1973. The mortality from legal abortion has decreased from 3.3 per 100,000 in 1973 to 0.6 per 100,000 in 1995. The freedom of physicians to develop safer abortion techniques is a major factor in this increase in safety.

29. The rates of abortion-related morbidity and mortality increase, however, as the pregnancy advances. Accordingly, any delay in obtaining an abortion is potentially harmful to the woman.

30. Abortions are performed for a variety of compelling reasons, and for women experiencing a variety of medical, social, psychological, and age-related conditions. Some women develop serious health problems because of their pregnancies, including gestational diabetes, preeclampsia, pregnancy-induced hypertension, and depression. In some cases, the fetus has been diagnosed with fatal or severe anomalies.

31. Most women who obtain abortions do so during the first thirteen weeks of pregnancy. There are a variety of deeply personal, moral, or conscientious reasons why women obtain abortions after this period. Some women, particularly those whose menses are irregular, or those who are taking hormonal contraceptives that mask the symptoms of pregnancy, recognize that they are pregnant only after several weeks or even months of gestation. Some women, especially young women, fear telling their parents or partner about the pregnancy. Others have abortions in the second trimester because they cannot find a provider or pay for the procedure earlier. Some have medical reasons or other personal reasons that delay their decision.

32. In general, continued pregnancy and childbirth present higher risks to women's health and lives than abortion does, and these risks are even higher for women with preexisting health conditions, such as hypertension, obesity, heart disease, cancer, diabetes, lupus, and other physical and mental health disorders.

33. The cost of an abortion increases incrementally as the pregnancy advances. Accordingly, if the Act delays a woman in obtaining an abortion, it will likely increase the cost of the procedure. For some women, increased cost and delay will make the procedure impossible to obtain.

34. If women in the United States must go outside the country for an abortion, they may be forced to travel significant distances. This travel will both increase the cost of an abortion and delay its performance, thus increasing the risk to the woman. Many women in these circumstances will be unable to obtain an abortion at all.

**VI.     Abortion Procedures**

35. The following abortion procedures may be used to terminate a pregnancy: suction curettage; dilation and evacuation (D&E); intact dilation and evacuation (intact D&E), also

known as dilation and extraction (D&X); induction; and hysterectomy/hysterotomy. In addition, some physicians offer medical abortions through nine weeks of pregnancy LMP. Importantly, physicians may use a combination of these methods depending on such factors as the physician's skill, the gestational age of the fetus, and the woman's medical history.

36. In the early 1970's, inducing labor was the predominant method of second trimester abortion. Today, however, surgical procedures, the D&E or intact D&E, account for about 96% of post-first-trimester abortions; inductions account for about 4%; and hysterotomy and hysterectomy less than 1%.

37. The D&E procedures and the induction method are considered by the medical community to be safe methods of terminating a pregnancy after the first trimester.

38. The D&E procedures are the only post-first-trimester abortion procedures that are generally not performed in a hospital or hospital-level setting.

39. For women for whom induction is contraindicated, the D&E procedures are the only safe abortion procedures after the first trimester of pregnancy that do not require major surgery or compromise future fertility. Moreover, in circumstances where an induction is not successful, a D&E must be performed.

## VII. The Act's Effects on Women's Access to Abortion

40. The term "partial-birth abortion" is not a medical term, and does not describe any one particular abortion procedure recognized in medicine. Nor does the Act's definition of "partial-birth abortion" refer to any recognized abortion procedures by name to further define the term, or to exclude those procedures from the scope of the Act. *Compare Carhart*, 530 U.S. at 939 (noting that the language of the Nebraska statute "does not track the medical differences between

10

D&E and D&X – though it would have been a simple matter, for example, to provide an exception for the performance of D&E and other abortion procedures.").

41. The Act applies to abortions performed on "living fetus[es]" throughout pregnancy and without regard to viability.

42. Because of the breadth and ambiguity in the Act's definition of "partial-birth abortion," the Act could reach any D&E, intact D&E, or induction abortion starting at the beginning of the second trimester of pregnancy.

43. In D&E, intact D&E, and induction procedures, a physician may deliver the portion of a "living fetus" specified in the Act -- either intact or disjoined -- "outside the body of the mother," prior to fetal demise. In order to complete the abortion in a safe and medically appropriate manner, the Physicians may then be required to perform an "overt act, other than completion of delivery," that the Physicians know will, and that does, result in fetal demise, thereby potentially triggering the Act's criminal and civil penalties.

44. Like the Nebraska statute struck down in *Carhart,* the Act contains a scienter requirement, requiring the physician to act "deliberately and intentionally." However, this scienter requirement is inadequate to protect the physician because every step taken during an abortion is done deliberately and intentionally, rather than by happenstance.

45. Moreover, in every abortion, including D&Es, intact D&Es, and inductions, the physician's "purpose" in bringing the fetus to the point specified in the Act is always to perform actions that complete the abortion as safely and quickly as possible; completion of an abortion of a nonviable fetus always results in fetal demise.

46. The Act fails to give physicians fair warning as to what conduct is prohibited, and forces them to guess whether performing a safe medical procedure falls within the Act's proscription.

47. Because of the Act's breadth and vagueness, United States Attorneys nationwide may differ widely over what conduct they believe is proscribed by the Act. The Act thus subjects physicians to the risk of arbitrary and discriminatory prosecution.

48. Because the Act merely permits, but does not require, the State Medical Board to provide a physician defendant accused of violating the Act with a hearing, enforcement of the Act may be arbitrary and discriminatory depending on the state in which the physician is charged with violating the Act.

49. Enforcement of the Act will prevent some women from obtaining abortions altogether; delay some women in obtaining abortions, thus increasing the risks of the procedure; and force some women to have riskier procedures, or to endure risks that endanger their health. In some cases, enforcement of the Act will increase the possibility of damage to women's lives and health.

50. The provisions of the Act permitting civil lawsuits against physicians potentially prevent women from obtaining an abortion at all. If a physician fails to obtain the consent of the man who impregnated the woman, or the consent of the parents of the woman if she is under eighteen, the physician is subject to civil suit under the Act, unless the pregnancy resulted from that person's criminal conduct. This effectively requires that the physician, in order to be protected from civil liability, obtain the consent of these third parties before performing the abortion, thus giving these third parties the power to exercise a veto over a woman's choice to have an abortion. Fear of disclosure to a partner or a parent will deter some women from seeking abortion services. Notification of a partner or parent of an impending abortion also may result, in some instances, in the partner or parent subjecting the woman to physical or mental abuse. Some parents and partners may even prevent a woman from seeking an abortion at all.

51. The Act also exposes to criminal liability the officers, agents, servants, and employees of Plaintiffs; those individuals, including both medical and non-medical staff, with whom Plaintiffs work, whom they teach, or whose work they supervise in providing procedures that fall under the Act; and the facilities at which they perform such procedures. By imposing potential criminal liability on these individuals and entities, the Act further impedes the abilities of Plaintiffs to provide the safest, most appropriate medical care to their patients by performing procedures covered by the Act.

52. The Act does not permit a physician to perform a pre- or post-viability "partial-birth abortion" to protect a woman from damage to her health (including her future fertility), no matter how serious, permanent, or irreparable that damage may be, as long as it falls short of endangering her life. Nor would an abortion be permitted when the fetus suffers from severe or even fatal fetal anomalies.

53. The Act's narrow life exception does not appear to apply if an abortion is necessary to save a woman's life, but a procedure that is not banned by the Act (such as hysterectomy) would suffice to save her life, even if that other procedure would render the woman infertile.

54. Both the purpose and effect of the Act is to impose substantial obstacles in the path of women seeking abortions and severely restrict a woman's right to choose her own medical care.

55. By prohibiting or severely restricting physicians from performing the most common, least expensive, and safest abortion procedures, the Act impermissibly restricts women's ability to obtain abortions.

**VIII. Lack of Justification**

56. The Act cannot be justified by any legitimate, substantial, or compelling purpose.

57. The Act does not promote the woman's health, but rather endangers it.

**IX.   First Claim for Relief**

58. Plaintiffs hereby incorporate by reference Paragraphs 1 through 57 above.

59. The Act violates women's rights to privacy, life, and liberty guaranteed by the Due Process Clause of the Fifth Amendment in the following ways:

    a.   By prohibiting plaintiffs from performing so-called "partial-birth abortions," the Act has both the purpose and effect of imposing an undue burden on a woman's right to choose abortion and thus violates the woman's rights to privacy and liberty;

    b.   By forcing plaintiffs' patients to forego certain methods of abortion for no legitimate, substantial or compelling purpose, the Act violates their right to privacy and liberty in choosing their own medical care and preserving their bodily integrity;

    c.   By prohibiting plaintiffs from performing so-called "partial-birth abortions" when necessary to preserve a woman's health or when a "partial-birth abortion" is the most medically appropriate procedure for a particular woman, the Act violates the woman's right to privacy and liberty;

    d.   By prohibiting plaintiffs from performing a so-called "partial-birth abortion" in each circumstance in which it is necessary to save a woman's life, the Act violates the woman's rights to privacy and liberty necessary to preserve the right to life.

**X.   Second Claim for Relief**

60. Plaintiffs hereby incorporate by reference Paragraphs 1 through 59 above.

61. By failing to give adequate notice of the procedures it proscribes, and by encouraging arbitrary and discriminatory enforcement, the Act violates the rights of Plaintiffs and their staff, and is void for vagueness in violation of the Due Process Clause of the Fifth Amendment.

## XI. Third Claim for Relief

62. Plaintiffs hereby incorporate by reference Paragraphs 1 through 61 above.

63. By preventing only women from choosing medically appropriate health care treatment and endangering their lives and health, and by reinforcing outmoded stereotypes of women as being unable to choose the course of their own medical treatment, the Act discriminates against women on the basis of sex in violation of their right to equal protection guaranteed by the Fifth Amendment.

## XII. Fourth Claim for Relief

64. Plaintiffs hereby incorporate by reference Paragraphs 1 through 63 above.

65. By leaving to the discretion of individual State Medical Boards the decision whether to grant a hearing on whether a partial-birth abortion falls within the Act's exception, the Act subjects the individual physician to arbitrary denial of such a hearing in violation of the Due Process and Equal Protection Clauses of the Fifth Amendment.

## XIII. Injunctive Relief

66. Plaintiffs and their patients have no adequate remedy at law and will suffer irreparable harm for continued violations of their constitutional rights if the Act goes into effect.

67. Enforcement of the Act will force physicians to provide constitutionally protected, medically appropriate abortion procedures under threat of criminal prosecution, or to stop performing those procedures that fall within the Act's ban. The Act will prevent some patients from receiving abortion services; delay other women in obtaining abortions, thus increasing the medical risks to their life or health; force some women to obtain medical care that is more dangerous and more likely to deprive them of the ability to bear children in the future; deny

women the right to choose a safe and desired method to terminate a pregnancy; subject physicians who provide second-trimester abortions to the threat of arbitrary enforcement of the Act due to the vagueness of its proscriptions, further chilling their medical practice; and compromise patient confidentiality by compelling physicians to require spousal and parental consent before performing an abortion in order to avoid civil liability.

WHEREFORE, Plaintiffs ask this Court:

A. To issue a temporary restraining order, and a preliminary and permanent injunction restraining Defendant, his employees, agents, and successors in office from enforcing the challenged Act, including as against the plaintiffs and their officers, agents, servants, and employees; those individuals, including both medical and non-medical staff, with whom Plaintiffs work, whom they teach, or whose work they supervise in providing procedures that fall under the Act; and the facilities at which they perform such procedures.

B. To set the location for the trial in this matter in Lincoln, NE.

C. To enter judgment declaring the challenged Act to be in violation of the United States Constitution, and

D. To grant such other and further relief as this Court should find just and proper, including attorneys' fees and costs.

Dated: October 31, 2003                                          Respectfully submitted,

   /s Priscilla J. Smith
PRISCILLA J. SMITH
JANET CREPPS*
SUZANNE NOVAK*
NAN E. STRAUSS*
The Center for Reproductive Rights
120 Wall Street, 14th Floor
New York, NY  10005
(917) 637-3600

JERRY M. HUG
#21015
ALAN G. STOLER, P.C., L.L.O
1823 Harney St., Suite 1004
Omaha, NE 68102
(402) 346-1733


Attorneys for Plaintiffs

*Application for admission pro hac vice
    pending